**DUBAI ISLAMIC BANK, Plaintiff,**

v.

**CITIBANK, N.A., Defendant.**

**No. 99 CIV.1930(RMB).**

United States District Court, S.D. New York.

Dec. 29, 2000.

John K. Crossman, Zeanick Horton, Guiliord, McGovern Palmer & Fognaillp, New York City, for plaintiff.

Davis J. McInerney, Davis, Polk & Wardwell, New York City, for defendant.

## *ORDER*

BERMAN, District Judge.

Plaintiff Dubai Islamic Bank ("Plaintiff" or "DIB") filed this action against Defendant Citibank, N.A. ("Defendant" or "Citibank") on or about March 15, 1999. Plaintiff's complaint alleges nine causes of action: (i) breach of contract; (ii) breach of implied covenant of good faith and fair dealing; (iii) negligent performance of contractual services; (iv) negligence; (v)

negligence per se; (vi) strict liability for facilitating "financial terrorism;" (vii) unjust enrichment; (viii) violation of 18 U.S.C. § 1962(b); and (ix) violation of 18 U.S.C. § 1962(c).[1] Defendant now moves to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure ("Fed. R.Civ.P." or "Rules") 12(b)(6) for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff opposes Defendant's motions and, among other things, seeks discovery pursuant to Fed.R.Civ.P. 56(f).[2] Plaintiff also moves to strike the affidavits of Citibank employees James A. Forde ("Forde Affidavit") and Thomas M. Lahiff, Jr ("Lahiff Affidavit"). Oral argument was held on March 27, 2000. (*See* Transcript).

**For the reasons set forth below, Plaintiff's Rule 56(f) application for discovery is granted; Defendant's motion for summary judgment is denied, without prejudice; Plaintiff's motion to strike is denied as moot; and Defendant's motion to dismiss is granted in part and denied in part.**

## I. *Background*

**The following allegations, which are set forth in the complaint, are taken as true for the purposes of this motion.** *See Friedlander v. Roberts,* 51 F.Supp.2d 385, 386 (S.D.N.Y.1999).

In or about 1975, DIB and Citibank commenced a correspondent banking relationship that included the establishment of DIB's correspondent account in Citibank's New York office. At that time, DIB and Citibank entered into a contract for ser-

vices. The terms of the contract consisted of, among other things. DIB's agreement to pay correspondent banking fees to Citibank and Citibank's agreement to service DIB's correspondent account, perform transactions authorized by DIB, and safeguard DIB's correspondent account by enforcing money laundering and Citibank's so-called "know your customer" rules.

As part of its advertised "know your customer" policy, Citibank represented that it prepares a financial profile for each new customer, and that, among other things, such profile preparation verifies the customer's financial history and source of wealth. Citibank also represented that it undertakes the following due diligence before accepting new Private Bank[3] clients: (i) verification of the customer's identity; (ii) verification of the customer's financial history and source of wealth; (iii) review of the customer's credit and character; (iv) understanding the types of transactions the customer would typically conduct; and (v) obtaining at least two detailed references from reliable, independent sources. Citibank's "know your customer" policy also required managers to visit Private Bank customers' homes and businesses regularly.

DIB also alleges that, Foutanga Dit Babani Sissoko ("Sissoko"),[4] a reputed international financial terrorist, opened a bank account at the Citibank branch at 460 Park Avenue, New York, New York, within days of his arrival in the United States on or about November 24, 1995. At that time, Sissoko became acquainted with Mona Searles who worked at Citibank as a teller. Within a few days of Sissoko opening his

---

1. Plaintiff's eighth and ninth claims fall under the Racketeering Influenced and Corrupt Organization Act of 1970 ("RICO").

2. In addition to its Memorandum of Law in Opposition to Defendant's Motion to Dismiss and for Summary Judgment, Plaintiff has filed a Rule 56(f) Affidavit (with Exhibits) and Supplemental Rule 56(f) Affidavit (with Exhibits).

3. Plaintiff alleges that the Private Bank is a "secretive department" within Citibank which is used "as a tool for wealthy patrons to accomplish secret, untraceable financial transactions without regard to the legality or legitimacy of such transactions." (Complaint ("Compl."), ¶ 1).

4. "Upon information and belief, Sissoko is a citizen of the Republic of Mali." (Compl., ¶ 21).

account, Mona Searles introduced Sissoko to her friend and co-worker, Pia Hurst.[5] Shortly thereafter, Sissoko opened a Private Bank account at Citibank managed by Pia Hurst.

Beginning on or about November 28, 1995, and continuing until at least January 27, 1998, in excess of $151,000,000.00 (one hundred and fifty-one million dollars) was debited by Citibank from DIB's correspondent account without proper authorization, and the proceeds were credited to numerous locations around the world (including other accounts at Citibank) through a series of financial transactions, each of which was less than $1,000,000.00 in amount, and nearly all of which were amounts of round thousand dollars.[6] **Sissoko caused these transactions to be made and was assisted by Pia Hurst (and, apparently, Mona Searles).**

Citibank caused DIB's correspondent account to be debited and the various accounts of Sissoko and others to be credited, including the following accounts: (i) Sissoko's Citibank Private bank account; (ii) two numbered accounts at Citibank Switzerland held by Sissoko associates Mamadou Diao and Sekou Diao; (iii) Mamadou Diao's account at Citibank International, plc in Paris; (iv) Sissoko's Swiss "Yungo" bank account; and (v) various accounts at four Miami, Florida banks held by Abdou Karim Pouye ("Pouye"), the chief financial officer for Sissoko's purported business interests. None of these debits and credits were properly authorized by DIB's Board of Directors and were contrary to DIB's interest.

On or about November 27, 1997, Commercebank National Association in Miami, Florida ("Commercebank") refused to complete Citibank's request to transfer approximately $400,000 from DIB's correspondent account to Pouye's Commercebank Account No. 1185001811706, because Commercebank had closed Pouye's account for activity Commercebank deemed improper. Despite having notice of Commercebank's refusal, Citibank continued to transfer millions of dollars to accounts held by Pouye after November 27, 1997 and failed to alert DIB that Commercebank had closed Pouye's account as a result of "suspicious" activity.

Citibank failed to notify DIB and failed to take any action to prevent or stop the debiting of funds from DIB's correspondent account and crediting of the accounts of Sissoko and his confederates. As a result of Citibank's inaction, its employee Mona Searles received approximately $516,000 of funds "stolen" from DIB's correspondent account.

Citibank also assisted Sissoko in removing millions of dollars from Sissoko's Citibank Private Bank account in cash and cashiers checks. Under the account management of Pia Hurst. Sissoko used his Citibank Private Bank account to remove millions of dollars through a series of smaller financial transactions.

In April 1998, DIB discovered that Sissoko's scheme had resulted in losses from DIB's correspondent account. Since that time, DIB has undertaken a series of actions to reduce the damage resulting from Sissoko's scheme. By telefaxes dated April 13, 1998, and April 16, 1998, DIB notified Citibank of the scheme and requested Citibank's assistance in preventing further movement of DIB's funds located in the accounts of Sissoko's confederates under the control of Citibank and its affili-

---

**5.** Sissoko had a romantic relationship with Mona Searles; they held themselves out as married from about December 1995 onward. In the spring of 1996, Sissoko provided Mona Searles with hundreds of thousands of dollars to purchase a new residence at 7 Prosperity Lane, Suffern, New York. These funds were taken from DIB's account at Citibank. Until approximately May 1997, Sissoko provided

Mona Searles with money which Ms. Searles apparently used to pay for living expenses.

**6.** Plaintiff alleges that the transactions were structured in this way "to conceal or disguise the nature, location, source, ownership, or control of the proceeds" of this activity. (Compl., ¶ 36).

ates. By telefax dated April 15, 1998, Citibank responded to DIB suggesting that DIB "hire an attorney in the United States."[7]

On or about March 15, 1998, Mohamed Ayyoub Mohamed Saleh, an alleged participant in the Sissoko scheme, was arrested in Dubai with the assistance of DIB. On or about March 17, 1998, Hussain El Refaie, another participant in the scheme, was arrested in Dubai with the assistance of DIB. Warrants for Sissoko's arrest are outstanding in Dubai and Switzerland.

In April and May of 1998, DIB caused: (i) the account(s) of Sissoko at Banque Multi Commerciale in Geneva, Switzerland to be frozen, and documents concerning the account(s) to be seized; (ii) the account of Helene Assa Camara at Banque Multi Commerciale in Geneva, Switzerland to be frozen; and (iii) the accounts of Mamadou Diao and Sekou Oumar Diao at Citibank, Geneva to be frozen. At the request of DIB, the Dubai prosecutor's office made a mutual assistance request to law enforcement officials in Switzerland, on or about May 19, 1998, in an attempt to recover assets stolen from DIB's correspondent account.

On or about July 1998, DIB filed a civil action in the Isle of Man to block the account of M.K. Musa that contained funds stolen from DIB's correspondent account. On or about December 9, 1998, DIB filed a criminal complaint in France in an attempt to recover assets stolen from DIB's correspondent account. A "Juge d'Instruction" has been appointed to review the com-

plaint, and action has been taken to seize bank accounts at Citibank, Paris, and obtain relevant information. On or about December 18, 1998, DIB filed a criminal complaint in Senegal against Sissoko and his confederates, including Pouye, his wife Yacine Pouye, Oumar Kante, and Helene Assa Camara, in an attempt to recover assets stolen from DIB's correspondent account. Oumar Kante, Pouye, and Yacine Pouye were arrested in Senegal. Oumar Kante and Pouye are in detention.

Citibank's Private Bank is currently the subject of an investigation by the United States Attorney's Office, Southern District of New York, concerning the "know your customer" rules and "facilitation of money laundering."

DIB ceased its correspondent banking relationship with Citibank in December 1998.

## II. *Standard of Review*

In resolving a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.[8] *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In other words, the burden upon the movant is very substan-

---

7. Citibank points out that "[r]emarkably, DIB's complaint in this case avoids referring to the complicity in the alleged scheme of DIB's own officers and employees. Although DIB chose not to disclose this complicity in the instant action, it has admitted in other actions brought in this Court and in the Eleventh Judicial Circuit in Florida that the scheme to defraud was carried out by 'several high level [DIB] officials.' The complaints in the other actions specifically allege that these officials included DIB's 'Assistant Managing Director,' Mohammed Ayyoub Mohammed Saleh ..., who was the 'manager of its main branch in the Emirate of Dubai,' and DIB's

'Chief Accountant,' Hussein Ibrhim El Refaie ..., as well as other DIB employees acting pursuant to the direction of Saleh and Refraie ..." (Memorandum of Law in Support of Citibank's Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment ("Defendant's Moving Br.") at 2).

8. As explained in Section III (*see* below), the Court is treating Defendant's motion as a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

tial, as the issue before the Court on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' " *Gant v. Wallingford Board of Education,* 69 F.3d 669, 673 (2d Cir.1995)(quoting *Weisman v. LeLandais,* 532 F.2d 308, 311(2d Cir. 1976)(per curiam)). "The motion to dismiss for failure to state a claim is disfavored ..." *Bower v. Weisman,* 639 F.Supp. 532, 539 (S.D.N.Y.1986)(citing *Arfons v. E.I. du Pont De Nemours & Co.,* 261 F.2d 434, 435 (2d Cir.1958)). While " 'the well-pleaded material allegations of the complaint are taken as admitted ... conclusions of law or unwarranted deductions of fact are not admitted.' " *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995) (citations omitted).

### III. *Analysis*

**Plaintiff's Application for Discovery Pursuant to Rule 56(f)**

■ Plaintiff argues that Defendant's motion for summary judgment is premature and inappropriate because discovery is needed and **there has as yet been no formal discovery in this case.**[9] (*See* Memorandum of Law in Opposition to Defendant's Motion to Dismiss and For Summary Judgment ("Plaintiff's Opposition Br.") at 7–8). Generally, "[a] party opposing a motion for summary judgment must have had the opportunity to discover information that is essential to its opposition to the motion." *Sutera v. Schering Corporation,* 73 F.3d 13, 18 (2d Cir.1995) (citations omitted). *See also Bonnie & Company Fashions, Inc. v. Bankers Trust Company,*

945 F.Supp. 693, 706 (S.D.N.Y.1996)("Rule 56(f) requires courts to ensure that parties have a reasonable opportunity to make their record before ruling on a motion for summary judgment"). "Most courts are reluctant to grant summary judgment prior to the termination of discovery." *United States v. Price,* 577 F.Supp. 1103, 1115 (D.N.J.1983).

■ "This Circuit has established a four-part test for the sufficiency of an affidavit [such as that submitted here by Plaintiff] submitted pursuant to Rule 56(f). The affidavit must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994). Rule 56(f) is a safeguard against premature grants of summary judgment and " 'should be applied with a spirit of liberality.' " *Bonnie & Company Fashions, Inc.,* 945 F.Supp. at 706 (citation omitted). *See also Waldron v. British Petroleum Co.,* 231 F.Supp. 72, 94 (S.D.N.Y.1964)("Rule 56(f) motions should be liberally granted ..."). Rule 56(f), however, " 'is not a shield against all summary judgment motions. Litigants seeking relief under the rule must show that the material sought is germane to the defense ...' " *Paddington Partners,* 34 F.3d at 1138 (citation omitted).

■ Plaintiff's Rule 56(f) Affidavit (and Supplemental Rule 56(f) Affidavit) satisfy the test articulated by the Court of Appeals for the Second Circuit. That is, Plaintiff's Rule 56(f) Affidavits: (i) set forth a detailed listing of the nature of the uncompleted discovery (*see* Rule 56(f) Affidavit, ¶¶ 6–10; Supplemental Rule 56(f) Affidavit, ¶¶ 4, 9, 10); (ii) explain how the

---

9. Fed.R.Civ.P. 56(f) provides that: "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

facts sought are reasonably expected to create a genuine issue of material fact (*see* Rule 56(f) Affidavit, ¶¶ 11–12; Supplemental Rule 56(f) Affidavit, ¶ 13); (iii) describe the efforts made to obtain those facts (*see* Rule 56(f) Affidavit, ¶¶ 6–9, 13–14; Supplemental Rule 56(f) Affidavit, ¶¶ 2, 4, 8, 12); and (iv) why those efforts were unsuccessful (*see* Rule 56(f) Affidavit ¶ 14; Supplemental Rule 56(f) Affidavit, ¶¶ 2, 14). Plaintiff's Rule 56(f) Affidavit even includes a proposed first request to produce documents (Exhibit ("Exh.") 5); proposed first set of interrogatories (Exh. 6); and proposed notices of deposition (Exh.'s 7–8).[10]

Plaintiff's application for discovery pursuant to Fed.R.Civ.P. 56(f) is granted and Defendant's motion for summary judgment is denied as premature (and without prejudice). *See Sutera,* 73 F.3d at 18 ("[s]ummary judgment was entered before any discovery had taken place. In these circumstances, it cannot be said that plaintiff had a full and fair opportunity to show that [defendant's] articulated reason for his dismissal was pretextual"); *Niagra Mohawk Power Corporation v. Consolidated Rail Corporation,* 97 F.Supp.2d 454, 458 (N.D.N.Y.2000)("[i]t is premature to grant USX summary judgment, as no formal discovery has taken place yet"). *See also Toebelman v. Missouri–Kansas Pipe Line Co.,* 130 F.2d 1016, 1022 (3d Cir.1942); *Concord Laboratories, Inc. v. Concord Medical Center,* 552 F.Supp. 549, 554 (N.D.Ill.1982).[11] Because the Court is treating Defendant's motion as a motion to dismiss (indeed, it is so styled) pursuant to Fed.R.Civ.P. 12(b)(6), Plaintiff's motion to strike the affidavits of James A. Forde and Thomas M. Lahiff, Jr. is dismissed as moot.

**Claims One through Seven—Article 4A of New York's Uniform Commercial Code**

■ Defendant argues that claims one through seven of DIB's complaint are precluded by Article 4A of New York's Uniform Commercial Code ("Article 4A") and should be dismissed. (*See* Defendant's Moving Br. at 10–18; Citibank's Reply Memorandum of Law ("Defendant's Reply Br.") at 4–7). Plaintiff responds that, among other things, "a bank is not immune from common law liability arising from its tortious conduct simply because wire transfers may be involved." (Plaintiff's Opposition Br. at 9). Dismissal of these claims on the basis of Article 4A is inappropriate at this time.

First, it appears that Defendant's argument relies (in part at least) upon information set forth in the Forde Affidavit which should not be considered on a motion to dismiss. (*See* Defendant's Moving Br. at 10, 12). Second, the law concerning Article 4A "exclusivity" appears to be evolving, even after the Second Circuit's decision in *Grain Traders, Inc. v. Citibank, N.A.,* 160 F.3d 97 (2d Cir.1998), so as to make dismissal at the pleading stage inappropriate here. *See generally* Hyung J. Ahn, Note, *Article 4A of the Uniform Commercial Code: Dangers of Departing from the Rule of Exclusivity,* 85 Va. L.Rev. 183 (1999). Third, the principle case cited by Defendant in support of its position, *Grain Traders, Inc. v. Citibank, N.A.,* was decided in the context of a motion for summary judgment— not a motion to dismiss which has a very different evidentiary threshold. *See, e.g., Friedlander,* 51 F.Supp.2d at 388; *Beverly v. Network Solutions, Inc.,* 1998 WL 320829 at *3 (N.D.Cal. June 12, 1998),

---

**10.** In addition, Plaintiff correctly states that "pursuant to the instructions of the Court at the pre-motion conference, DIB has propounded no discovery requests to Citibank nor sought to take the depositions of any of its employees," (Rule 56(f) Affidavit, ¶ 14), contemplating, among other things, the filing of a motion to dismiss. (*See* Scheduling Order, dated May 27, 1999). Plaintiff has apparently

pursued discovery through collateral (informal) means.

**11.** It appears that much of the information necessary to support Plaintiff's claims is "within the exclusive knowledge of the opposing party." *Waldron,* 231 F.Supp. at 94. *See also Price,* 577 F.Supp. at 1115–16.

*aff'd,* 2000 WL 1836759 (9th Cir. Dec.13, 2000)("the granting of a motion to dismiss is subject to an even more stringent standard than one for summary judgment"); *Amendola v. Bayer,* 1988 WL 128687 at *2 (N.D.Ill. Nov.21, 1988), *aff'd,* 907 F.2d 760 (7th Cir.1990)("[i]t is axiomatic that different standards are used to evaluate motions to dismiss under Rule 12(b)(6) and motions for summary judgment under Rule 56").

For these reasons, among others, the Court believes that it would be inappropriate to dismiss Plaintiff's claims on the basis of Article 4A at this early stage of the litigation.[12]

### Claim Four—Negligence

■ Defendant argues that "DIB cannot bring a negligence claim based on allegations that Citibank failed to use reasonable care in performing the duties it had under its correspondent banking contract with DIB." (Defendant's Reply Br. at 7). Plaintiff contends that "Citibank had a legal duty to detect, stop, and refrain from participating in, a scheme to steal and launder hundreds of millions of dollars from DIB" and that "Citibank breached its ordinary duty of care to DIB by failing to take numerous actions to prevent or stop money laundering, and by taking actions to further money laundering." (Plaintiff's Opposition Br. at 14, 15).

■ "To sustain a claim for negligence, a plaintiff must show that the defendant owed the plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as a proximate result of that breach." *King v. Crossland Savings Bank,* 111 F.3d 251, 259 (2d Cir.1997). While it is true that "merely charging a breach of a 'duty of care', employing lan-

guage familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim." (*Clark–Fitzpatrick, Inc. v. Long Island Rail Road Company,* 70 N.Y.2d 382, 390, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)), "it does not follow that because acts constitute a breach of contract they cannot also give rise to liability in tort." *Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 899 (2d Cir. 1980).[13] "If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort. But if in addition there is an interest in protecting the plaintiff from other kinds of harm, the plaintiff may recover in tort whether or not he has a valid claim for breach of contract." *Id.* (citations omitted).

Courts have stated that banks owe a duty of care to their customers. *See King,* 111 F.3d at 259 (affirming district court decision that "[c]onced[ed] that banks do, in fact, owe a duty of care to their customers ..."); *Bank Brussels Lambert, S.A. v. Intermetals Corporation,* 779 F.Supp. 741, 747 (S.D.N.Y.1991)("it is true without question that [Bank Brussels Lambert, S.A.] had a duty to exercise reasonable skill and care in carrying out its activities for its customer ..."). *See also Long Island Savings Bank v. Savage,* 145 Misc.2d 731, 548 N.Y.S.2d 363 (N.Y.Sup. Ct.1988). Accordingly, Plaintiff's negligence claim should not be dismissed at this time; discovery may lead to evidence that bears upon, among other things, the question whether Defendant had a "duty" to Plaintiff independent of any alleged contractual obligations.

---

12. As noted, the Court is treating Defendant's motion as a Rule 12(b)(6) motion to dismiss. **The Court is in no sense ruling upon the ultimate merits of the parties' claims.**

13. " 'Between actions plainly ex contractu and those as clearly ex delicto there exists what has been termed a border-land, where the lines of distinction are shadowy and ob-

scure, and the tort and the contract so approach each other, and become so nearly coincident as to make their practical separation somewhat difficult.' " *Sommer v. Federal Signal Corporation,* 79 N.Y.2d 540, 550–51, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) (citation omitted).

### Claim Five—Negligence Per Se

Plaintiff alleges that Defendant violated a criminal money laundering statute, 18 U.S.C. § 1956, and that such purported violation caused its loss. Defendant argues that Plaintiff's claim for negligence per se fails as a matter of law.

"Rarely is there a private right of action under a criminal statute." *Schwartz v. F.S. & O Associates, Inc.*, 1991 WL 208056 at *2 (S.D.N.Y. Sept.27, 1991).

"Under the rule of negligence per se, if a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation, the issues of the defendant's duty of care to the plaintiff and the defendant's breach of that duty are conclusively established upon proof that the statute was violated." *German v. Federal Home Loan Mortgage Corp.*, 896 F.Supp. 1385, 1396 (S.D.N.Y. 1995). "The issue of whether a plaintiff can assert a cause of action based on negligence per se is closely related to the question of whether a private cause of action exists under a statute." *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413, 428 (M.D.Pa. 1989).

The statute at issue here, 18 U.S.C. § 1956, does not express a private right of action. *See* 18 U.S.C. § 1956. Thus, the existence of a private right of action "turns upon whether it fairly can be implied from a reading of the statute." *Gain v. Eastern Reinforcing Service, Inc.*, 193 A.D.2d 255, 257, 603 N.Y.S.2d 189 (N.Y.App.Div.1993). In making this determination, the Court examines the following factors: "(1) whether the plaintiff is a member of a class for whose special benefit the statute was enacted, (2) whether there is any indication of legislative intent to create or deny a private right, (3) whether it would be consistent with the purposes of the underlying statutory scheme to create a private right, and (4) whether the cause of action is one traditionally relegated to state law." *Schwartz*, 1991 WL 208056 at *2 (citing *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)).

An examination of these factors makes clear that 18 U.S.C. § 1956 does not give rise to a private right of action. First, 18 U.S.C. § 1956 "does not provide a benefit to any class of persons more limited than the public at large." *Schwartz*, 1991 WL 208056 at *2. Second, "there is no indication in the sparse legislative history that Congress intended [18 U.S.C. § 1956] to give rise to a private civil remedy. In light of the presumption against implying such remedies from criminal statutes, this is hardly surprising." *Id.* Third, "it would be inconsistent with the statutory scheme to imply a private right." *Id.* Finally, although money laundering is not traditionally relegated to state law, "the other factors weigh so heavily against implication that this consideration has little significance." *Id.* at *3. *See also Thompson v. Kramer*, 1994 WL 725953 at *15 (E.D.Pa. Dec.29, 1994)("plaintiff has not pointed to and I have not found anything in the legislative history of [18 U.S.C. § 1956] that would indicate that Congress intended to provide a civil cause of action ...").

Because 18 U.S.C. § 1956 "does not provide a benefit to any class of persons more limited than the public at large," (*Schwartz*, 1991 WL 208056 at *2), and does not give rise to a private cause of action, DIB's negligence per se claim fails. *See Sage Enterprises, Inc. v. Wells Fargo Alarm Services, Inc.*, 1996 WL 1057144 at *5 (E.D.N.Y. June 20, 1996).

### Claim Six—Strict Liability for Facilitating Financial Terrorism

Plaintiff argues that "Citibank's repeated practice of actively recruiting known financial terrorists ... each of whom is capable of destabilizing an entire country if not an entire region, and providing them any service for which they are willing to pay, is an abnormally dangerous activity in the age of the internet and the

global economy ..." (Plaintiff's Opposition Br. at 18). Defendant contends that the Court should reject Plaintiff's "novel contention that correspondent and consumer banking are abnormally dangerous activities that should subject Citibank to strict liability." (Defendant's Moving Br. at 22).

 Under New York law, a defendant may be held strictly liable for engaging in "abnormally dangerous activity" if an innocent person is harmed. The following six factors are weighed in determining whether an activity is "abnormally dangerous": (i) existence of a high degree of risk of some harm to the person, land or chattels of others; (ii) likelihood that the harm that results from it will be great; (iii) inability to eliminate the risk by the exercise of reasonable care; (iv) extent to which the activity is not a matter of common usage; (v) inappropriateness of the activity to the place where it is carried on; and (vi) extent to which its value to the community is outweighed by its dangerous attributes. *See Doundoulakis v. Town of Hempstead,* 42 N.Y.2d 440, 448, 398 N.Y.S.2d 401, 368 N.E.2d 24 (1977).

 Strict liability is typically applied to (often physically dangerous) activities such as blasting (*see Spano v. Perini Corporation,* 25 N.Y.2d 11, 302 N.Y.S.2d 527, 250 N.E.2d 31 (1969)), and use of atomic energy. *See Hamilton v. Accu–Tek,* 935 F.Supp. 1307, 1323 (E.D.N.Y.1996)("[w]hile not restricted to injuries that occur on the defendant's property, the rule is considered as imposing strict liability for 'non-natural' uses of land. Examples of strict liability under this theory include use of atomic energy, the manufacture, storage or use of high explosives, the operation of oil or gas wells, the use of large storage tanks for gas or other flammable materials, or the operation of high voltage power lines")(citation omitted). *See also French Putnam LLC v. County Environmental*

*Services,* 2000 WL 1172341 at *13 (Conn.Super.Ct. July 21, 2000)(" '[t]he courts ... which recognize the doctrine of strict liability for dangerous activities, impose it only in narrow circumstances' ") (citation omitted). This Court does not feel it is appropriate to expand the scope of the strict liability doctrine to embrace the banking and financial issues presented here.

### Claim Seven—Unjust Enrichment

Plaintiff argues that it has alleged all of the elements necessary to sustain a claim for unjust enrichment. (*See* Plaintiff's Opposition Br. at 19). Defendant does not dispute that Plaintiff has alleged these elements, but argues that the claim should be dismissed relying (solely) upon an unreported decision of the New York State Supreme Court.[14] (*See* Defendant's Moving Br. 23).

 " 'An unjust enrichment claim under New York law must contain the following elements: (1) the defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit would be unjust.' " *Serendip LLC v. Franchise Pictures LLC,* 2000 WL 1277370 at *7 (S.D.N.Y. Sept.7, 2000)(quoting *Gidatex v. Campaniello Imports, Ltd.,* 49 F.Supp.2d 298, 301 (S.D.N.Y.1999)). "The third element is satisfied when the circumstances are such 'that equity and good conscience require defendant to make restitution.' " *Gidatex,* 49 F.Supp.2d at 301 (citation omitted).

It appears that Plaintiff has adequately plead the necessary elements of unjust enrichment— which is all that is required at this stage. *See Serendip LLC,* 2000 WL 1277370 at *7 ("[p]laintiff has sufficiently (at this pre-discovery stage of the litigation) set forth a claim for restitution and unjust enrichment and thus. Warner

---

**14.** Defendant relies upon *First Union Nat'l Bank v. A.G. Edwards & Sons,* Index No. 601243/98 (N.Y.Sup.Ct., Jan. 5, 1999). Although entitled to respectful consideration, such decisions are of little (or no) precedential value. *See Eaton v. Chahal,* 146 Misc.2d 977, 553 N.Y.S.2d 642, 646 (N.Y.Sup. Ct.1990).

Brothers' motion to dismiss for failure to state a claim is DENIED in part").

### Claims Eight and Nine—RICO

" 'Civil RICO is an unusually potent weapon— the litigation equivalent of a thermonuclear device.' " *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 (S.D.N.Y. 1998) (citation omitted).

 Plaintiff's eighth claim is for violation of 18 U.S.C. § 1962(b).[15] "The purpose of Section 1962(b) is to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking." *Goldberg v. Merrill Lynch,* 1998 WL 50200 at *4 (S.D.N.Y. Feb.9, 1998). That is not, as a matter of law, the situation here. Defendant argues that:

> According to DIB, Citibank's Private Bank and its alleged clients, including Sissoko, Raul Salinas de Gotari, Benazir Bhutto and Asif Ali Zadari, 'associated in fact' to form a RICO enterprise.... For this allegation to be sustained, DIB would have to plead, and ultimately prove, that Sissoko and other individuals named in this paragraph had something more to do with each other than allegedly banking at the same institution. **No such pleading is even attempted.**

(Defendant's Moving Br. at 27)(emphasis added). *See Schmidt,* 16 F.Supp.2d at 349 (S.D.N.Y.1998)("the Supreme Court has defined a RICO enterprise as a 'group of persons associated together for a common purpose of engaging in a common course of conduct ...' The existence of a RICO enterprise is 'proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.' ")(quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)); *First Nationwide Bank v. Gelt Funding Corp.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993)("[c]onclusory allegations that disparate parties were associated by virtue of their involvement in the real estate industry in the 1980s are insufficient to sustain a RICO claim, absent allegations as to how the members were associated together in an 'enterprise' "), *aff'd,* 27 F.3d 763 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). *See also Amsterdam Tobacco Inc. v. Philip Morris Inc.,* 107 F.Supp.2d 210, 214–15 (S.D.N.Y.2000).

Defendant also asserts that "DIB does not allege here, as it must to sustain its claim, that the alleged RICO person—Citibank—acquired or maintained control over the alleged RICO enterprise—Citibank's Private Bank—through a pattern of racketeering." (Defendant's Moving Br. at 28). This argument is also persuasive. *See Goldberg,* 1998 WL 50200 at *4 ("[t]here is no allegation in the complaint that any person has acquired or maintained control of Merrill Lynch through racketeering activities").

The legal insufficiency of Plaintiff's claim under § 1962(b) is implicitly conceded in Plaintiff's opposition brief where it does not (adequately) address Defendant's argument for dismissal of this claim.[16] *See Anti–Monopoly, Inc. v. Has-*

---

**15.** Section 1962(b) provides that: "It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).

**16.** In response to Defendant's challenge, Plaintiff states, in a footnote, that "DIB's eighth claim for relief sets forth an alternative basis for imposing RICO liability on Citibank for its maintenance and acquisition of the Private Bank and its clients that engage in international money laundering activities resulting in injury to numerous victims including DIB." (Plaintiff's Opposition Br. at 20 n. 7). **This is not enough.** *Cf. Brown v. North Central F.S., Inc.,* 173 F.R.D. 658, 670 (N.D.Iowa 1997)("[a]rguments in briefs are no substitute for pleading of the requisite facts"); *Rathert v. Village of Peotone,* 1987 WL 15775 at *1 (N.D.Ill.1987)("[a]lthough plaintiffs have attempted to set forth their theory of entitlement in their legal memorandum, such arguments cannot substitute for actual pleadings").

*bro, Inc.,* 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.1997)("the failure to provide argument on a point at issue constitutes abandonment of the issue"), *aff'd,* 130 F.3d 1101 (2d Cir.1997), *cert. denied,* 525 U.S. 813, 119 S.Ct. 48, 142 L.Ed.2d 37 (1998). *See generally Schmidt,* 16 F.Supp.2d at 346 ("[b]ecause the mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation") (citations omitted)(quotations omitted).

■ Plaintiff's ninth claim is for violation of 18 U.S.C. § 1962(c).[17] Plaintiff maintains that "[t]hrough its ongoing efforts to trace and recover the funds laundered by the Sissoko enterprise, DIB uncovered extensive involvement by Citibank that included branches and employees in New York, Dubai, Geneva, Gabon, Tokyo, London and Paris." (Plaintiff's Opposition Br. at 22). Defendant contends that "DIB has utterly failed to allege, as it must to survive a Rule 12(b)(6) motion, that Citibank as an institution 'operated' or 'managed' the affairs of the alleged RICO enterprise as required by *Reves v. Ernst & Young* ..." (Defendant's Reply Br. at 9). While Defendant's position has (some) merit, "it will not always be reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether a [defendant] ... participated in the 'operation and management' of the enterprise." *Friedman v. Hartmann,* 1994 WL 376058 at *2 (S.D.N.Y. July 15, 1994).[18] But the inquiry does not end here.

Defendant further argues—in the Court's view correctly—that Plaintiff's ninth claim should be dismissed because "DIB's RICO pleadings do not begin to allege that Citibank was a central figure in the scheme to defraud DIB or that Citibank benefitted from the alleged Sissoko scheme. Here, the only Citibank employees specifically alleged to have assisted Sissoko are a sales manager and a teller. This is simply not enough to hold Citibank vicariously liable under RICO." (Defendant's Moving Br. at 25). The Court agrees. *See Laro, Inc. v. Chase Manhattan Bank,* 866 F.Supp. 132, 140 (S.D.N.Y. 1994)(" '[i]n order to establish corporate liability under Section 1962(c) ... it is necessary to show that an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity ... [t]he court may then consider other factors, among them the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these high-level employees themselves committed the alleged predicate acts, and whether the corporation directly and substantially benefitted from the racketeering activity' ") (citation omitted), *aff'd,* 60 F.3d 810 (2d Cir.1995); *Qatar National Navigation & Transportation Co. Ltd. v. Citibank, N.A.,* 1992 WL 276565 at *5 (S.D.N.Y. Sept.29, 1992)("[i]n order to create a strong inference that Citibank was involved, the plaintiff must allege some higher level of complicity that merely the participation of [an Assistant Vice–President and Manager of Citibank's branch office in Bronxville] and the use of Citibank equipment to perpetrate the scheme"), *aff'd,* 182 F.3d 901 (2d Cir.1999). *See also Renner v.*

---

**17.** Section 1962(c) provides that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

**18.** The *Friedman* Court also noted that "[i]t bears observation that Reves itself was decided not on a motion made at the pleadings stage, but on a motion for summary judgment." *Friedman,* 1994 WL 376058 at *2.

*Chase Manhattan Bank,* 1999 WL 47239 at * 10–11 (S.D.N.Y. Feb.3, 1999).

## IV. *Conclusion*

For the foregoing reasons, Plaintiff's Rule 56(f) application for discovery is granted; Defendant's motion for summary judgment is denied, without prejudice [21–2]; Plaintiff's motion to strike is denied as moot [12–1]; and Defendant's motion to dismiss is granted in part and denied in part [21–1].[19]

The parties are directed to arrange a scheduling/settlement conference, in person or by telephone, with Court Deputy Christine Murray. **The parties are also directed to engage in good faith settlement negotiations prior to the conference.**

19. Defendant's motion to dismiss is **denied** as to Plaintiff's claims for breach of contract; breach of implied covenant of good faith and fair dealing; negligent performance of contractual services; negligence; and unjust enrichment. Defendant's motion to dismiss is **granted** as to Plaintiff's claims for negligence per se; strict liability for facilitating financial terrorism; violation of 18 U.S.C. § 1962(b); and violation of 18 U.S.C. § 1962(c).